UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| JA SOLAR INTERNATIONAL LIMITED, <br> JA SOLAR USA INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Ct. No. 21-00514 <br> Nonconfidential Version |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2
MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS JA
SOLAR INTERNATIONAL LIMITED AND JA SOLAR USA INC.**

Jeffrey S. Grimson
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

March 10, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

RULE 56.2 STATEMENT ................................................................................................. 1

STANDARD OF REVIEW ................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

    I.    ISEC and JA Solar Developed a Robust Record Demonstrating that ISEC's Sales Were Destined for the United States ................................................................................... 4

    II.    Commerce Wrongly Dismissed Evidence on the Record Demonstrating that ISEC Had Knowledge that its Sales Were Destined for the United States ................................. 14

    III.    Commerce's Determination Was Not Supported by Substantial Evidence Because It Relied on a Mere Scintilla of Evidence to Support its Conclusion .......................... 23

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

Albemarle Corp. & Subsidiaries v. United States,
  821 F.3d 1345 (Fed. Cir. 2016) ................................................................................ 17

Canadian Solar, Inc. v. United States,
  918 F.3d 909 (Fed. Cir. 2019) .................................................................................. 2

Changzhou Trina Solar Energy Co. v. United States,
  __ CIT __, 352 F. Supp. 3d 1316 (2018) ................................................................ 17

Durum Gida Sanyi Ve Ticaret A.S. v. United States,
  __ CIT __, 311 F. Supp. 3d 1367 (2018) ................................................................ 19

Hiep Thanh Seafood Joint Stock Co. v. United States,
  35 CIT 734, 781 F. Supp. 2d 1366 (2011) .............................................................. 20

Huayin Foreign Trade Corp. v. United States,
  322 F.3d 1369 (Fed. Cir. 2003) ................................................................................ 1

Hyundai Elecs. Indus. Co. v. United States,
  28 CIT 517, 342 F. Supp. 2d 1141 (2004) .......................................... 15, 16, 21, 22

INA Walzlager Schaeffler KG v. United States,
  21 CIT 110, 957 F. Supp. 251 (1997) ........................................................ 3, 15, 16

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ................................................................................................... 2

Nippon Steel Corp. v. United States,
  458 F.3d 1345 (Fed. Cir. 2006) ........................................................................... 2, 23

NMB Sing. Lts. v. United States,
  557 F.3d 1316 (Fed. Cir. 2019) ...................................................................... 2, 20, 21

RHP Bearings v. United States,
  288 F.3d 1334 (Fed. Cir. 2002) ........................................................................... 2, 17

Stupp Corp. v. United States,
  __ CIT __, 359 F. Supp. 3d 1293 (2020) .............................................................. 3, 20

Swiff-Train Co. v. United States,
   793 F.3d 1355 (Fed. Cir. 2015) ............................................................................. 1, 24

Universal Camera Corp. v. NLRB,
   340 U.S. 474 (1951) ................................................................................................. 2

Wonderful Chem. Indus. v. United States,
   27 CIT 411, 259 F. Supp. 2d 1273 (2003) ......................................................... 3, 25

Yue Pak v. United States,
   20 C.I.T. 495 (1996) ........................................................................................ 25, 26

**Statutes**

19 U.S.C. § 1677a ........................................................................................................ 2


**Other Authorities**

Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Results of Antidumping Duty
   Administrative Review, 76 Fed. Reg. 36,086 (Dep't of Commerce June 21, 2011) .......... 15, 19

Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order, 80
   Fed. Reg. 8,596 (Dep't of Commerce Feb. 18, 2015) ............................................... 28

Certain Crystalline Silicon Photovoltaic Products From Taiwan:  Final Results of Antidumping
   Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review;
   Final Determination of No Shipments; 2019-2020, 86 Fed. Reg. 49,509 (Dep't of Commerce
   Sept. 3, 2021) ......................................................................................................... 1

Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Determination of Sales at
   Less Than Fair Value, 79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) .................. 17

Final Determination of Sales at Not Less Than Fair Value: Pure Magnesium from the Russian
   Federation, 66 Fed. Reg. 49,347 (Dep't of Commerce Sept. 27, 2001) ............................. 26, 27

Final Results of Antidumping Duty Administrative Review: Certain In-Shell Raw Pistachios
   from Iran, 70 Fed. Reg. 7,470 (Dep't of Commerce Feb. 14, 2005) .................................. 26, 27

Fuel Ethanol From Brazil; Final Determination of Sales at Less Than Fair Value, 51 Fed. Reg.
   5,572 (Dep't of Commerce Feb. 14, 1986) .............................................................. 3

Grain-Oriented Electrical Steel from the Czech Republic: Final Determination of Sales at Less
   Than Fair Value and Final Affirmative Determination of Critical Circumstances, 79 Fed. Reg.
   58,324 (Dep't of Commerce Sept. 29, 2014) .......................................................... 14

Statement of Administrative Action Accompanying the Trade Agreements Act of 1979, H.R. Rep. No. 4537, 388, reprinted in 1979 U.S.C.A.N. 665 ........................................................... 2

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs JA Solar International Limited and JA Solar USA Inc. (collectively, "JA Solar"), hereby move for judgment upon the agency record.

## RULE 56.2 STATEMENT

JA Solar challenges certain aspects of the Final Results of the fifth administrative review of the antidumping duty ("AD") order on crystalline silicon photovoltaic products ("solar products") from Taiwan conducted by the U.S. Department of Commerce ("Commerce"). See Certain Crystalline Silicon Photovoltaic Products From Taiwan:  Final Results of Antidumping Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2019-2020, 86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021) ("Final Results") (P.R. 198), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R. 197).  The review in question covers entries of solar products during the period February 1, 2019, through January 31, 2020.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . .  to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation omitted).   Substantial evidence requires "more than a mere scintilla."  Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted). Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall consider not only the information that supports the agency's decision but also whatever in the record "which fairly detracts from its weight."  Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).  Further, the arbitrary and capricious standard requires that "Commerce's determination is the product of reasoned decisionmaking" or "a reasoned explanation."  Canadian Solar, Inc. v. United States, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983)).  Commerce cannot treat nearly identical facts differently without providing a reasonable explanation for its change in methodology.  See NMB Sing. Lts. v. United States, 557 F.3d 1316, 1328 (Fed. Cir. 2019); see also RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (citation omitted) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

## ARGUMENT

Section 772(a) of the Tariff Act of 1930 establishes the basis for export price as:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677a(a).  To effectuate Section 772(a), Commerce has established and applied a "knowledge test" for purposes of determining whether sales of subject merchandise should be treated as U.S. sales.  A producer passes the knowledge test if the "producer knew or had reason to know at the time of sale that the goods were for export to the United States."  Statement of Administrative Action Accompanying the Trade Agreements Act of 1979, H.R. Rep. No. 4537, 388, 411, reprinted in 1979 U.S.C.A.N. 665, 682 (emphasis added).  Commerce's application of the knowledge test hinges on whether a respondent knew, or should have known, the ultimate destination of merchandise at the time of the sale.  See, e.g., Fuel Ethanol From Brazil; Final Determination of Sales at Less Than Fair Value, 51 Fed. Reg. 5,572 (Dep't of Commerce Feb. 14,

1986) (determining that "the distillers supplying the trading companies knew or should have known the destination of the anhydrous fuel ethanol at the time of the sale to the trading companies during our review period").

In evaluating whether a respondent "knew" the ultimate destination of its sales, "{t}he only way to determine <u>actual</u> knowledge is through an <u>admission</u> of the respondent."  <u>INA Walzlager Schaeffler KG v. United States</u>, 21 CIT 110, 125, 957 F. Supp. 251, 265 (1997), <u>aff'd</u> 108 F.3d 301 (Fed. Cir. 1997) (emphasis added); <u>see also</u> <u>Wonderful Chem. Indus. v. United States</u>, 27 CIT 411,417, 259 F. Supp. 2d 1273, 1280 (2003)  (upholding Commerce's finding that a company knew or had reason to know that its exports were destined for the United States partially on the basis that the company admitted to having knowledge that its sales were destined for the United States).  In the absence of such an admission, or actual knowledge, Commerce must "look to other evidence to determine whether a {respondent} <u>should have known</u> that the goods were not for home consumption."  <u>INA Walzlager</u>, 21 CIT at 125, 957 F. Supp. at 265 (emphasis added).  Under the "should have known" threshold, "Commerce need not find that the producer had actual knowledge of the final destination of its exports."  <u>Wonderful Chem.</u>, 27 CIT at 416; 259 F. Supp. at 1279.  The knowledge test requires that Commerce "must diligently inquire into allegations of knowledge and render its conclusion based on all relevant facts and circumstances" in the record. <u>Stupp Corp. v. United States</u>, __ CIT __, __, 359 F. Supp. 3d 1293, 1310 (2020).  Here, ISEC Solar Energy Corporation and E-TON Solar Tech. Co., Ltd. (collectively, "ISEC") met both the "knew" and "should have known" thresholds that its sales to JA Solar were destined for the United States.  Commerce's determination that ISEC did not pass the knowledge test, and its corresponding exclusion of these sales for purposes of calculating ISEC's final dumping margin, was not supported by substantial evidence because the only reasonable reading of the record as a whole,

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

when the robust record developed by JA Solar is properly considered, was that ISEC knew or had reason to know that its sales to JA Solar were destined for the United States.

### I.   ISEC and JA Solar Developed a Robust Record Demonstrating that ISEC's Sales Were Destined for the United States

The record includes three different types of evidence, which all demonstrate that ISEC knew (actual knowledge), or, at a minimum, had reason to know (constructive knowledge) that its sales to JA Solar were destined for the United States.  First, ISEC admitted to its actual knowledge in its responses to Commerce's questionnaires.  ISEC also submitted an affidavit from its Managing Director as well as a declaration from a representative of JA Solar, both of which contain admissions of ISEC's knowledge that its solar cells were destined for the United States.  Second, ISEC then corroborated these admissions with documentation including WeChat conversations, emails and a draft purchase contract exchanged between ISEC and JA Solar.  Third, JA Solar supported ISEC's admissions of knowledge by establishing a closed-loop showing that ISEC's sales were delivered to the United States.  Commerce's determination that ISEC lacked knowledge was not supported by substantial evidence because it either arbitrarily rejected record evidence in conflict with its past practice or improperly ignored record evidence that detracted from its ultimate conclusion.

First, ISEC established that it had actual knowledge by setting forth in detail the sales arrangement between itself and JA Solar in its responses to Commerce's questionnaires.  From its initial response to Commerce's Section A questionnaire, ISEC set forth that it arranged with JA Solar to send its solar cells to JA Solar's subcontractor in [ ▇▇▇▇ ] for further processing into modules prior to their shipment to the United States.  See Letter on Behalf of ISEC to Dep't of Commerce re: Section A Resp. at A-2 (July 16, 2020) (Business Proprietary Version) ("ISEC Sec.

A Resp.") (C.R. 10-12) (noting that "ISEC knew that the ultimate destination of the sales to this customer was the United States").  The timeline of this sales arrangement is as follows:

| Date | Event | Record Citation |
|---|---|---|
| March 2019 | JA Solar began to engage in discussions with ISEC concerning its intentions to purchase solar cells from ISEC that would be sent to [ ████ ] for further processing into modules prior to shipment to the United States. | Letter on Behalf of ISEC to Dep't of Commerce re: Inventec's Sections A-D Supplemental Questionnaire Resp. at 9 (Oct. 5, 2020) (Business Proprietary Version) ("ISEC Second Supp. Sec. A Resp.") (C.R. 67) |
| June 2019 | ISEC came to an agreement with JA Solar that "the United States was the final destination of the cells sold to JA Solar that were shipped to its designated subcontractor in [ ████ ]." | ISEC Second Supp. Sec. A Resp. at 8-9 (Business Proprietary Version) (C.R. 67) |
| July 2019 | Based on this agreement, ISEC began to ship cells purchased by JA Solar to [ ████ ] to be assembled into modules by JA Solar's subcontractor prior to being shipped to the United States. | ISEC Second Supp. Sec. A Resp. at 9 (Business Proprietary Version) (C.R. 67) |
| August 2019 | ISEC formalized its ongoing arrangement to ship its cells to [ ████ ] for further processing prior to being shipped to the United States in a written sales contract. | ISEC Second Supp. Sec. A Resp. at 9-10 (Business Proprietary Version) (C.R. 67) |
| September 2019 | Following ongoing discussion to formalize ISEC's shipping arrangement with JA Solar, the two parties finalized a new sales contract. | ISEC Second Supp. Sec. A Resp. at 9-10 (Business Proprietary Version) (C.R. 67) |

Based on its actual knowledge of this sales arrangement, ISEC included its sales to JA Solar that were sent to [ ████ ] in its sales file because it knew or had reason to know that these solar cells were ultimately destined for the United States.  See ISEC Second Supp. Sec. A Resp. at 9 (Business Proprietary Version) (C.R. 67).  ISEC also added a column "AC" in sales database "to further illustrate that ISEC had actual knowledge (code "A") of the United States being the final destination of the cells shipped to [ ████ ] for JA Solar because such sales were made pursuant to the agreements between the parties in June 2019."  Id. at 12.  By contrast, ISEC excluded its

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

sales to JA Solar that it shipped to a place other than [ ███████ ] because ISEC had no knowledge of the final destination of these cells.  See id.

Commerce determined that the "record lacks documentary support for ISEC's claim that it had knowledge at the time of the sale to {JA Solar}, that the merchandise at issue was destined for the United States."  See Final I&D Mem. at Cmt. 2, p. 8 (P.R. 197).  In rejecting ISEC's claim, Commerce focused on language in the sales contract that formalized the already ongoing shipping arrangement between the two parties.  See id. at Cmt. 2, p. 10 ("Although ISEC claims that this contract language is not meaningful, the negotiated language that ISEC officials required in the contract indicates that ISEC really did not know where the solar cells would ultimately go.").  The language at issue in the formalized sales contract provided that the [ █████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ]."  See Letter from Dep't of Commerce to ISEC re: Supplemental Section A, B, C and D Questionnaire at 3-4 (Aug. 6, 2020) (Proprietary Document) ("Aug. 6 Supp. QR") (C.R. 29) (emphasis added).[1]

---

[1] JA Solar notes that Commerce does not explicitly link its concerns to this language in the contract. Instead, Commerce noted that "the contract terms agreed upon by parties deliberately left ambiguous the ultimate destination of the merchandise, even though no other possible destination was named."  Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197).  Commerce, however, repeatedly referred to this language in its questionnaires to ISEC.  See August 6 Supp. QR at 3-4 (Proprietary Document) (C.R. 29) ("The sample purchase contract provided at Exhibit A-2 only states that: [ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ ]); see also Letter on Behalf of Dep't of Commerce to ISEC re: Supplemental Section A, B, C and D Questionnaire (Sept. 15, 2020) (Business Proprietary Document) (C.R. 65) ("Identify whether each sale to JA Solar was pursuant to a purchase agreement indicating that merchandise [ ██████████████████████████████████████████████ ], based on the language of the agreement (i.e., if the field is named [ ████████████████████████ ]").  JA

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Commerce relied on [ ███████████████ ] in a purchase contract to discount the substantial evidence on the record, as set forth in detail below, demonstrating that ISEC knew or had reason to know that its sales were destined for the United States.

Contrary to Commerce's factual finding that the sales contract indicated that ISEC did not know the destination its sales, ISEC and JA Solar staff confirmed that the language of interest to Commerce did not change the underlying understanding between the two companies that ISEC's solar cells were ultimately destined for the United States.  See Letter on Behalf of ISEC to Dep't of Commerce re: Inventec's Supplemental Questionnaire Resp. at SA-4 to SA-6 (Public Version) (Aug. 24, 2020) ("ISEC Supp. Sec. A Resp.") (P.R. 78); ISEC Second Supp. Sec. A Resp. at 8-12 (Public Version) (P.R. 92).  Both parties clarified that the [ ████████ ] was inserted into the sales contract based on the suggestion of ISEC's legal department to account for the fact that "JA Solar, and not ISEC, was responsible for the final delivery to the United States after ISEC delivered the solar cells to [ ██████ ] for assembly and competition into PV module."  See ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5; Aff. (Business Proprietary Version) (C.R. 30-31).  The Sales Manager of ISEC confirmed that this revision "did not alter {his} knowledge that the United States would be the final destination of {ISEC's} products sold to JA Solar and shipped to [ ██████ ] after June 2019."  Id.  Similarly, the [ ██████████ ] of JA Solar explained that JA Solar had [ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

Solar, therefore, presumes that the "ambigu{ity}" identified by Commerce refers to this language in the sales contract based on Commerce's focus on this language during its review.

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

██████ ]. Id. at Ex. SA-ISEC-5; Decl.  In support of these claims, the [ ████████████ ]

of JA Solar noted that [ ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████ ]. Id.

Second, although it was not required to, ISEC went a step further than a mere admission in

its responses to Commerce's questionnaires by submitting other documents on the record that

demonstrate that it knew, or at a minimum, should have known, that its sales to JA Solar were

destined for the United States.  See id. at SA-4 to SA-6, Ex. SA-ISEC-5. These documents

highlight the ongoing discussions between the two parties and confirm that the addition of

[ ██████ ] to the sales contract did not alter ISEC's understanding that its cells were ultimately

destined for the United States.  See id.  Specifically, ISEC submitted the following documentation

on the record demonstrating its knowledge:

| Item | Quotation from Record | Record Citation |
|---|---|---|
| Signed affidavit from ISEC sales manager, Dino Yang, attesting to prior knowledge of the ultimate destination of sales | "{I}n June 2019, I was told by my supervisor that he was contacted by and had agreed with JA Solar's procurement department to ship our products (i.e., solar cells) to a subcontractor (i.e., [ ██████ ██████ ]) engaged by JA Solar in [ ██████ ] for assembly of modules which would be subsequently delivered by JA Solar **to the United States**.  I was instructed by my supervisor to follow up with JA Solar's procurement department on the negotiations of the selling price and other sales terms for these transactions. Therefore, starting from June 2019, when I negotiated the sales terms with JA Solar, I was aware of the fact that our solar cells sold to JA Solar, that were to be shipped to [ ██████ ], **were destined for the United** | ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5; Aff. (Business Proprietary Version) (C.R. 30-31) (emphasis added) |



|  |  |  |
|---|---|---|
|  | **States** after its designated subcontractor completed the assembly process in [ ▮▮▮▮ ].<br><br>After ISEC completed some shipments to [ ▮▮▮▮▮ ] in July 2019, JA Solar decided to sign a purchase contract stipulating general terms and conditions pertaining to the purchases and supplies. JA Solar sent via e-mail a purchase contract to me in late August 2019, in which JA Solar confirmed in a remark that the products purchased from ISEC would be assembled into modules in [ ▮▮▮▮ ] before they **were delivered to the United States.**<br><br>. . . .<br><br>I knew at all times before and after the sales were made to JA Solar that the solar cells we shipped to [ ▮▮▮▮ ] would end up in the United States based on the discussions with JA Solar throughout the sales process and my longstanding knowledge of JA Solar's business model and past dealings with JA Solar." |  |
| Signed declaration from JA Solar's [ ▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮ ▮▮ ▮▮▮▮ ] | "In the first half of 2019, JA Solar International Limited [ ▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ].<br><br>In these discussions, JA Solar International Limited expressly informed ISEC that cells to be delivered to [ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮ ]. | ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5; Decl. (Business Proprietary Version) (C.R. 30-31) (emphasis added) |

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED



| | [ ].” | |
|---|---|---|
| WeChat communications[2] from March 2019 between staff of ISEC and JA Solar confirming that JA Solar had a verbal understanding with ISEC that ISEC's cells were ultimately destined for the United States | "[ ]" | ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) (emphasis added); see also ISEC Second Supp. Sec. A Resp. at 9 (Public Version) (P.R. 92) (discussing Wechat conversations) |

---

[2] Although treated as proprietary in the ISEC's initial supplemental questionnaire response, ISEC later publicly disclosed that it submitted WeChat communications on the record.  See ISEC Second Supp. Sec. A Resp. at 9 (Public Version) (P.R. 92) (discussing Wechat conversations with JA Solar's representative).



| Email from August 2019 attaching a draft of final sales contract[3] focused upon by Commerce from JA Solar to ISEC setting forth that the goods were destined for the United States | [ ██████████ ] | ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) (emphasis added); ISEC Second Supp. Sec. A Resp. at 10 (Public Version) (P.R. 92) (discussing email communications and draft contract) |
| Email communication from August and September 2019[4] changing the purchase contract from [ ██████████ ] to [ ██████████ ]. | [ ██████████ ] | ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31); ISEC Second Supp. Sec. A Resp. at 10-11 (Public Version) (P.R. 92) (discussing email communications and draft contract) |

---

[3] Although treated as proprietary in the ISEC's initial supplemental questionnaire response, ISEC later publicly disclosed that it submitted a draft contract on the record.  See ISEC Second Supp. Sec. A Resp. at 9-10 (Public Version) (P.R. 92) (discussing a draft contract submitted in August through email communications).

[4] Although treated as proprietary in the ISEC's initial supplemental questionnaire response, ISEC later publicly disclosed that it entered into a final sales contract in September 2019.  See ISEC

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

No party submitted information, or even argued, that ISEC lacked knowledge that its sales to JA Solar were ultimately destined for the United States based on the information submitted above. See Letter on Behalf of JA Solar to Dep't of Commerce re: Case Br. at 7, 14-15 (June 8, 2021) (Public Version) ("JA Solar Case Br.") (P.R. 184).  In sum, ISEC admitted to knowledge of its sales from the very beginning of this review in its Section A Response and then went a step further by providing an affidavit, declaration and documentation of correspondence between itself and JA Solar, which together confirm that ISEC had actual knowledge that its sales were destined for the United States.

Third, Commerce's determination overrode the ultimate destination of ISEC's solar cells as confirmed by every party in the supply chain.  As part of its sales agreement with JA Solar, ISEC requested that JA Solar keep [████████████████████████████████████████████

████████████████████████████████████████ ].  See ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) ( [████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ ]).  In keeping such [████████ ], JA Solar was able to submit sales, production and shipment documents (i.e., shipment data) on the record to establish [██████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████ ].  See Letter on Behalf of JA Solar to Dep't of Commerce re: Clarification of ISEC Supplemental Questionnaire at 2-3, Ex.

Second Supp. Sec. A Resp. at 9-10 (Public Version) (P.R. 92) (discussing that ISEC and JA Solar entered into a final contract in September 2019).

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

1 (Aug. 31, 2020) (Business Proprietary Document) (C.R. 37-47) (setting forth how JA Solar's

purchases from ISEC connect via a [█████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ ]); see also JA Solar Case Br. at 5 (Public Version) (P.R. 184) (discussing shipment data).

Commerce did not seek any additional information or clarification on this information submitted

by JA Solar.

Although it did not seek any clarification on the information submitted by JA Solar,

Commerce did place on the record [████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████ ].  See Mem. from Elizabeth Urfer to Robert Bolling re: Notification of

Receipt of U.S. Entry Documents (Mar. 30, 2021) (Business Proprietary Document) (C.R. 136).

JA Solar [██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ ].  See Letter on Behalf of JA Solar to Dep't of Commerce re: Clarification of Receipt

of Entry Documents (Apr. 6, 2021) (Business Proprietary Document) (C.R. 139) (setting forth how

[███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ]).  Commerce

once again solicited no further information from JA Solar concerning these submissions nor

challenged that JA Solar demonstrated a closed-loop that ISEC's cells ultimately ended up in the

United States.  See Final I&D Mem. at Cmt. 2, p. 8 (P.R. 197) ("Although ISEC's customer clearly

13

sold the subject merchandise (*i.e.*, solar modules) to the U.S. . . .").  Instead, it acknowledged that

JA Solar demonstrated that ISEC's sales "entered the U.S. market."  Id.

In sum, ISEC and JA Solar developed a robust record of three different types of evidence

– admissions, sales documentation and corroborating shipment data – that all demonstrate that

ISEC knew or had reason to know that its sales were destined for the United States.

## II.    Commerce Wrongly Dismissed Evidence on the Record Demonstrating that ISEC Had Knowledge that its Sales Were Destined for the United States

At every turn in its Final Results, Commerce wrongly rejected the three types of evidence

set forth above, which each demonstrate that ISEC knew or had reason to know that its sales were

destined for the United States.  See Final I&D Mem. at Cmt. 2, p. 8 (P.R. 197) ("{W}e find that

the record lacks documentary support for ISEC's claim that it had knowledge at the time of the

sale to the customer.").  For the reasons set forth below, Commerce's determination that ISEC

lacked knowledge that its sales were destined for the United States was not supported by

substantial evidence because Commerce either arbitrarily dismissed evidence in contrast to its past

practices or outright failed to consider evidence on the record that detracted from its ultimate

conclusion.

Concerning the first type of evidence – admissions of knowledge – from the very beginning

of the current review, ISEC set forth that it knew that its sales were destined for the United States.

See ISEC Sec. A Resp. at A-2 (Business Proprietary Version) (C.R. 10-12); see also id. (Public

Version) (P.R. 57-59).  Commerce has previously accepted mere admissions of knowledge as

sufficient proof to satisfy its knowledge test.  See, e.g., Grain-Oriented Electrical Steel from the

Czech Republic: Final Determination of Sales at Less Than Fair Value and Final Affirmative

Determination of Critical Circumstances, 79 Fed. Reg. 58,324 (Dep't of Commerce Sept. 29,

2014), and accompanying Issues and Dec. Mem. at Cmt. 2 ("An admission by the producer or a

representative of the producer to the Department that it knew of the ultimate U.S. destination can also establish knowledge."); cf Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 36,086 (Dep't of Commerce June 21, 2011), and accompanying Issues and Dec. Mem. at Cmt. 1, p. 6 ("Welded Pipe I&D Mem.") ("{N}owhere on the record of this proceeding is there any statement from either TUNA or Mueller admitting or indicating or even implying actual knowledge of a destination in the United States for any specific sale of subject merchandise."). Commerce rejected ISEC's initial admission, which ISEC confirmed at every instance in response to further questions from Commerce. See ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31); ISEC Second Supp. Sec. A Resp. at 9-10 (Business Proprietary Version) (C.R. 67).[5] Commerce's rejection of ISEC's admission, therefore, was arbitrary and capricious because it failed to provide a sufficient explanation for treating these admissions differently than its past determinations, like in the Grain-Oriented Electrical Steel case, where Commerce found that a mere admission satisfied its knowledge test. See RHP Bearings, 288 F.3d at 1347.

Further, Commerce arbitrarily rejected similar admissions of knowledge in the affidavit from ISEC's sales director and the declaration from a representative of JA Solar as "self-serving statements made in response to Commerce's request for information, long after the sales were completed," Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197). In its past determinations, Commerce has relied upon testimony or other statements by interested parties as sufficient evidence to demonstrate that a respondent party knew or should have known that its merchandise was destined for the United States. See INA Walzalger, 21 CIT at 124-25, 957 F. Supp. at 264; Hyundai Elecs. Indus. Co. v. United States, 28 CIT 517, 523, 342 F. Supp. 2d 1141, 1148 (2004). For instance,

---

[5] The confidential version sets forth the evidence submitted on the record in detail.

in <u>INA Walzalger</u>, the Court determined that Commerce's finding that the respondent "knew or should have known" that the merchandise it sold to two companies was intended for export partially based on information "obtained as a result of interviews with German customers of {the respondent}." <u>INA Walzalger</u>, 21 CIT at 124-25, 957 F. Supp. at 264 (setting forth that Manager Director Managing Director of one of the respondent's customers explained that "all of the suppliers know that the {customer} 'is solely an exporter from their years of doing business with his company.'").   The Court determined "the comments of the representative of the firm visited by Commerce were sufficient to impute knowledge to the company." <u>Id.</u> at 125, 957 F. Supp. at 265.  Similarly, in <u>Hyundai</u>, the Court upheld Commerce's determination that testimony from the Global Accounts Manager of a respondent party's customer "supports Commerce's determination that {the respondent} knew or should have known that its {merchandise} were destined for the United States." <u>Hyundai</u>, 28 CIT at 523, 342 F. Supp. 2d at 1148. This Court should find the holdings in <u>INA Walzalger</u> and <u>Hyundai</u> to be persuasive given the factual similarities to the present action.  Here, the affidavit from ISEC's sales manager and the declaration from JA Solar's [ ███████████ ] both set forth that the parties were aware that ISEC's sales would be delivered to the United States.  ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31); <u>see also</u> ISEC Second Supp. Sec. A Resp. at 9-10 (Business Proprietary Document) (C.R. 67) (discussing that ISEC submitted affidavits signed by ISEC's sales manager and JA Solar's [ ███████████ ] which "confirmed . . . that ISEC knew that its cells . . . were destined ultimately the United States" ).  Commerce summarily dismissed these admissions because "{t}he memories of employees, even as sworn statements, are not documentary evidence of knowledge of the destination," but failed to provide a reasonable explanation for why it was treating these statements by employees differently from similar

statements that it had previously found in <u>INA Walzalger</u> and <u>Hyundai</u> to be sufficient to satisfy its knowledge test.  Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197).  Commerce's rejection of the affidavit and declaration demonstrating ISEC's knowledge, therefore, was arbitrary and capricious because Commerce provided "insufficient reasons for treating similar situations differently."  <u>RHP Bearings</u>, 288 F.3d at 1347.

Commerce's finding that the "{s}worn statements made <u>well after the time</u> of the specific sales at issue were not relevant to the analysis," and its reliance on its determination in the initial investigation for this claim, entirely ignores the second type of evidence – documentation from the relevant time of sales – that ISEC placed on the record to confirm its admissions of knowledge.  Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197) (emphasis added).  In relying on its initial investigation, Commerce flouted that "{t}he purpose of administrative reviews is to reassess earlier determinations in the light of data relevant to the period of review." <u>Changzhou Trina Solar Energy Co. v. United States</u>, __ CIT __, __, 352 F. Supp. 3d 1316, 1342 (2018) (citing <u>Albemarle Corp. & Subsidiaries v. United States</u>, 821 F.3d 1345, 1356-57 (Fed. Cir. 2016)).  In its final determination in the underlying investigation, Commerce found that the "speculation . . . is insufficient for the Department's knowledge determination."  <u>Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Determination of Sales at Less Than Fair Value</u>, 79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014), and accompany Issues and Dec. Mem. at Cmt. 4, p. 33 ("Investigation I&D Mem.").  By contrast, here there was no speculation as the Wechat and email communications between ISEC and JA Solar detailed the understanding between the companies that [ █████████████████████████████ █████████████████ ].  ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Business Proprietary

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Version) (C.R. 30-31) <u>see also</u> ISEC Second Supp. Sec. A Resp. at 9 (Public Version) (P.R. 92) (discussing Wechat conversations).

Further, in the initial investigation of this action, Commerce found that a respondent company failed to pass the knowledge threshold because it:

> {P}rovided no documentation on the record, prepared during the period of investigation, such as purchaser certificates, <u>contracts</u>, labeling or shipping documents, which indicated that certain Taiwanese cells were being shipped to third countries for the express purpose of being incorporated into a module, laminate and/or panel that was ultimately destined for the United States.

Investigation I&D Mem. at Cmt. 4, p. 33-34 (emphasis added).  Unlike in the initial investigation, the record here contains a draft contract that contradicts Commerce's conclusion that "ISEC's own statements made prior to the sales amount to an admission that it did not have such knowledge prior to the sales or at the time of the sales."  Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197).  The language in the draft contract sent by JA Solar sets forth that [ ███████████████████████ ███████████████████ ].  <u>See</u> ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31).  By initially proposing this language, the draft contract confirms that JA Solar informed ISEC of the ultimate destination of its merchandise at the time that Inventec was setting its prices. <u>See id.</u>; <u>see also</u> ISEC Second Supp. Sec. A Resp. at 9 (Public Version) (P.R. 92) (discussing how the draft purchase contract confirms ISEC's knowledge).  Since the purpose of the knowledge test is to determine if price discrimination occurred with respect to sales to the U.S. market, the knowledge of the ISEC sales person at the time prices were negotiated must necessarily outweigh a [ █████████ ] inserted into boilerplate contract language by overly-cautious in-house counsel with no apparent role in price-setting.  <u>See</u> ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) (showing that the [ █████████ ████████████████████████████████████ ]); <u>see also</u>

id.; Aff. (Public Version) (P.R. 78) ("{W}hen I negotiated the sales terms . . . I was aware of the fact that our solar cells . . . were destined for the United States."). As this was not an instance where the respondent failed to provide contemporaneous evidence supporting its admission of knowledge, Commerce's determination that the affidavit and declaration on the record were not relevant to its analysis was not supported by substantial evidence. Cf. Durum Gida Sanyi Ve Ticaret A.S. v. United States, __ CIT __, __, 311 F. Supp. 3d 1367, 1372 (2018) (sustaining Commerce's determination that a respondent knew that its sale was destined for the United States where the respondent "fails to establish how Commerce's stated practice of attaching 'more weight to documentary evidence than to statements such as declarations' was unreasonable in light of the record" because it did not provide "contemporaneous documentary evidence that would support {the declarant}'s assertions with respect to {the respondent}'s knowledge at the time of the non-POR").[6]

Commerce acknowledged that "ISEC and its customer communicated with each other via instant messaging, discussing the transactions, and specifically mentioning the U.S. destination."

_____

[6] For similar reasons, Commerce's reliance on its determination in Certain Circular Welded Non-alloy Steel Pipe from Mexico for its finding that documentary or physical evidence is "more probative, reliable, and verifiable than statements or declarations" is misplaced as the facts in that case are distinguishable from the present action. Final I&D Mem. at Cmt. 2, p. 9 (P.R. 197) (relying on Welded Pipe I&D Mem. at Cmt. 1, p. 5). In Welded Pipe, the respondent "expressly denied actual knowledge of a destination in the United States for any specific sale of subject merchandise." Welded Pipe I&D Mem. at Cmt. 1, p. 6. By contrast, ISEC expressly admitted that its sales to JA Solar were destined for the United States and submitted an affidavit and declaration confirming this knowledge. See ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) (The confidential version sets forth the evidence submitted on the record in detail). ISEC then submitted communications and a draft contract between the two companies during the relevant period of the sales that corroborate that ISEC knew that its sales were destined for the United States. Id.; see also ISEC Second Supp. Sec. A Resp. at 8-10 (Public Version) (P.R. 92).

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197).  But besides this brief acknowledgement, Commerce did not provide a reasonably discernable explanation, see NMB, 557 F.3d at 1319, for giving greater weight to [ ▮▮▮▮▮ ] in the purchase contract ([ ▮▮▮▮ ]) over the communications between ISEC and JA Solar that clearly demonstrated that ISEC knew that its sales were destined for the United States at the time key pricing negotiations specific to the U.S. market were ongoing. See Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197).  The facts in this case are analogous to Stupp Corp. and Hiep Thanh Seafood Joint Stock Co. v. United States, 35 CIT 734, 781 F. Supp. 2d 1366 (2011) ("Hiep Thanh II"), where the Court held that Commerce's determinations to include certain sales in either a respondent's home market database or as a part of its U.S. sales database were not supported by substantial evidence because Commerce failed to consider all record evidence when determining whether the respective respondent had knowledge that its sales were destined for the United States.  See Stupp Corp., __ CIT at __, 359 F. Supp. 3d at 1310 ("Commerce's conclusion that the challenged sales were home market sales fails to address record evidence that the subject merchandise was exported without further processing"); Hiep Thanh II, 35 CIT at 741, 781 F. Supp. 2d at 1373 ("Commerce's 'finding' that 'Hiep Thanh knew or should have known that the goods were being shipped to the United States,' is especially curious because Hiep Thanh freely admitted that fact during the administrative review.").  Here, Commerce merely concluded that "{a}t the end of the negotiations, the contract terms agreed upon by the parties deliberately left ambiguous the ultimate destination of the merchandise."  Final I&D Mem. at Cmt. 2, p. 10 (P.R. 197).  In reaching this conclusion, Commerce provided no explanation for discounting the statements in the email communications that the adjustments to the language in the draft purchase contract were at the request of ISEC's legal department and did not change the company's understanding of the ultimate destination of its sales.  See ISEC Supp. Sec. A Resp. at SA-5, Ex.

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31) ( [ ███████████████████

███████████████████████████████████████ ]).  Like in <u>Stupp Corp.</u>

and <u>Hiep Tienh II</u>, Commerce failed to consider all the record evidence when it provided no

explanation for why [ ████████ ] in the final shipping contract, which, importantly, merely

formalized an ongoing shipping arrangement between the two companies, outweighs the

significant record evidence demonstrating that ISEC's sales would be shipped to the United States.

<u>See</u> ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-

31) ( [ █████████████████████████████████████ ]);

<u>see also</u> see also ISEC Second Supp. Sec. A Resp. at 8-10 (Public Version) (P.R. 92).  Although

Commerce need not provide a perfect explanation, Commerce's determination was not supported

by substantial evidence because it failed to provide any, let alone a "reasonably discernable,"

explanation for weighing [ ████████ ] in the final purchase contract over the other evidence on the

record from the actual period of review that contradicted its determination.  <u>NMB</u>, 557 F.3d at

1319.

Finally, Commerce arbitrarily dismissed the third type of evidence – corroborating

shipment documentation submitted by JA Solar to demonstrate that ISEC's sales entered the

United States – despite previously relying on similar information to determine that sales were

destined for exportation to the United States.  <u>See</u> <u>Hyundai</u>, 28 CIT at 524, 342 F. Supp. 3d at

1148-49.  In dismissing this evidence, Commerce concluded that "whether or not the merchandise

entered the U.S. market is not the issue at hand, but rather, which entity set the price for the U.S.

market."  Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197).  Commerce's determination, however, does

not align with its past practice to rely on such information as corroborating evidence that a

respondent knew or should have known that its sales were destined for the United States.  For

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

example, in its investigation of Dynamic Random Access Memory Semiconductors of One Megabit or Above ("DRAMS") from the Republic of Korea, Commerce found, and the Court sustained, that a query from Customs showing that the DRAMS at issue had entered the United States corroborated a claim by an employee of the customer that its supplier knew that its sales were destined for the United States. See Hyundai, 28 CIT at 524, 342 F. Supp. 3d at 1149 ("The Customs data sufficiently corroborate {the employee}'s assertions, thereby supporting a finding that {the respondent} knew or should have known that the DRAMs sold to the customer's German subsidiary were destined for the United States.")  Here too, the documentation submitted by JA Solar demonstrating a closed-loop provides powerful corroborative evidence in support of the ISEC's admissions of knowledge.   Commerce incorrectly found that its determination in the DRAMs case was distinguishable from this action because the Customs data in DRAMS corroborated "statements against the respondent's own interests."  Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197).  Whether a statement was made for or against a respondent's own interest is irrelevant to the underlying question of knowledge or the corroboration of customs data supporting that knowledge.  Commerce's position that U.S. government data is only relevant and usable where it is adverse to a respondent is non-sensical.  Commerce's determination that the shipping data submitted by JA Solar were not relevant to its knowledge inquiry, therefore, was arbitrary and capricious because Commerce did not, nor could it, provide a reasonable explanation for failing to consider this corroborative evidence in conflict with its own past practice.

In sum, Commerce's determinations to discount all of the three types of evidence, i.e., statements of admission, sales documentation, and corroborating shipment documentation, submitted by ISEC and JA Solar to demonstrate that ISEC knew or had reason to know that its sales were destined for the United States, in favor of a [ ███████████████ ] added after prices

were negotiated, were not supported by substantial evidence.  Commerce's determination that ISEC lacked knowledge that its sales were destined for the United States was not reasonably discernable because it either arbitrarily dismissed certain information in conflict with its past practice or failed to outright consider certain evidence in its analysis.

### III.   Commerce's Determination Was Not Supported by Substantial Evidence Because It Relied on a Mere Scintilla of Evidence to Support its Conclusion

Commerce's determination that ISEC did not know that its sales to JA Solar were destined for the United States was not supported by substantial evidence because, once the record is considered as a whole, the only reasonable reading is that ISEC either knew (actual knowledge), or, at a minimum, had reason to know (constructive knowledge) that its sales to JA Solar were destined to the United States.  See Huayin, 322 F.3d at 1374 (Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

To be supported by substantial evidence, Commerce's determination must be based on the whole record including whatever in the "record fairly detracts from its weight." Nippon Steel, 458 F.3d at 1351.  Once Commerce properly considers the evidence that detracted from its conclusion, which it wrongly dismissed as set forth above, it is clear that ISEC had actual knowledge that its sales to JA Solar were destined for the United States.  Again, ISEC admitted to knowing that its sales were destined for the United States at the time prices were set based on an established ongoing shipping arrangement between the two companies and then provided actual documentation to support this claim in the form of an affidavit, declaration and communications between itself and JA Solar.  See ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5 (Public Version) (P.R. 78); see also ISEC Second Supp. Sec. A Resp. at 8-11 (Public Version) (P.R. 92).  Commerce even concurred that JA Solar corroborated these claims of knowledge by submitting shipment documentation demonstrating that ISEC's sales ended up in the United States.  See Final I&D

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Mem. at Cmt. 2, p. 11 (P.R. 197) ("Copious documentation was submitted to support that the merchandise at issue was made into solar panel in a third country and sold to the U.S."). Commerce has previously found that similar evidence was sufficient to meet the "knew" or "had reason to know" thresholds of its knowledge test.  See supra Section II.  Indeed, the heart of this comes down to the chart above in Section A, which, when weighed against [ ███████ ███ ], amply establishes that ISEC had actual knowledge that its sales were destined for the United States.  A mere cursory glance at that chart reveals that Commerce relied on "a mere scintilla" of evidence, i.e., [ ██████ ], to support its determination in face of an entire record that otherwise detracted from its determination.  Swiff-Train, 793 F.3d 1355, 1359.  Rather than a single "self-serving" statement, ISEC and JA Solar developed a robust record to support information submitted at the earliest phases of the case.  Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197).  Further, ISEC explained that the only piece of evidence that Commerce relied upon to support its determination – the [ ██████ ] in a sales contract – did not change ISEC's general understanding that its solar modules were destined for the United States.  See ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31); see also ISEC Second Supp. Sec. A Resp. at 8-11 (Business Proprietary Version) (C.R. 67).  Instead, this language was included at the recommendation of its legal department to account for the fact that ultimately a third-party contractor would deliver the assembled modules to the United States.  See id. Notwithstanding the cautious ISEC in-house contract attorney's concerns about lack of actual control over the ultimate delivery of the goods, there is no question that the prices between ISEC and JA Solar were set with the understanding from ISEC's perspective that the subject merchandise was intended for the United States.  See ISEC Supp. Sec. A Resp. at Ex. SA-ISEC-5; Aff. (Public Version) (P.R. 78) ("{W}hen I negotiated the sales terms . . . I was aware of the

fact that our solar cells . . . were destined for the United States."). This then is exactly the point at which Commerce would focus to determine if price discrimination on sales to the United States was occurring under the knowledge test. Based on the record as a whole, therefore, the only reasonable conclusion was that ISEC had actual knowledge that its sales were destined for the United States.

Although the record establishes that ISEC had actual knowledge that its sales were destined for the United States, at a minimum, ISEC met the lower bar that it had constructive knowledge that its sales were destined for the United States based on ISEC's understanding of its specific shipping arrangement with JA Solar. Commerce has previously found, and the Court has upheld these findings as supported by substantial evidence, that a company can show that it had a reason to know that its sales were destined for the United States based on specific shipping arrangements between companies. See, e.g., Wonderful Chem., 27 CIT at 417, 259 F. Supp. 2d at 1280; Yue Pak v. United States, 20 C.I.T. 495, 499-500 (1996). For instance, in Wonderful Chemicals, the Court sustained Commerce's finding that an exporter had "constructive or indirect knowledge" that its sales were destined for the United States based on Commerce's finding, among others, that the respondent admitted that it sold its merchandise to a customer that it knew only re-sold its merchandise to the United States. Wonderful Chem., 27 CIT at 417, 259 F. Supp. 2d at 1280.[7] Similarly, in Yue Pak, the Court found that "{t}he record contains evidence adequate to support

---

[7] Commerce found that Wonderful Chemicals was distinguishable from the facts in this action because the record in that case contained "Certificates of Origin and Fumigation, which explicitly stated that the exports were destined for the United States." Final I&D Mem. at Cmt. 2, p. 11 (P.R. 197) (internal quotation marks omitted). But, the certificates of origin and fumigation were just one of three separate factors that Commerce relied upon in making its knowledge finding. Wonderful Chem., 27 CIT at 417, 259 F. Supp. 2d at 1280. Further, here there were similar documents on the record here, i.e., Wechat communications and emails, which explicitly stated that the goods were destined for the United States. See ISEC Second Supp. Sec. A Resp. at 10 (Public Version) (P.R. 92).

Commerce's conclusion that {a respondent}'s suppliers knew of the U.S. destination of the merchandise" based on, among other reasons, a "pattern of knowledge" concerning the shipping arrangements in the industry.  Yue Pak, 20 C.I.T. at 499-500.  Much like in Wonderful Chem. and Yue Pak, based on its discussions with JA Solar, ISEC had constructive knowledge that the solar cells it sent to JA Solar's subcontractor in [ ████████ ] (an established shipping route) were destined for the United States.  See ISEC Supp. Sec. A Resp. at SA-5, Ex. SA-ISEC-5 (Business Proprietary Version) (C.R. 30-31); see also ISEC Second Supp. Sec. A Resp. at 8-12 (Business Proprietary Version) (C.R. 67).  ISEC, at a minimum, had constructive knowledge that its sales were destined for the United States based on this particular shipping route discussed between the two companies.

Commerce's determination constitutes a false equivalency between ISEC's knowledge of a specific shipping route with a "general knowledge or belief on the part of the first party in the sales chain that the next party generally sells some products to the U.S. would not meet this threshold."  Final I&D Mem. at Cmt. 2, p. 9 (P.R. 197) (emphasis added) (relying on Final Results of Antidumping Duty Administrative Review: Certain In-Shell Raw Pistachios from Iran, 70 Fed. Reg. 7,470 (Dep't of Commerce Feb. 14, 2005) ("Pistachios from Iran"), and accompanying Issues and Dec. Mem. at Cmt. 1 ("Pistachios I&D Mem.") and Final Determination of Sales at Not Less Than Fair Value: Pure Magnesium from the Russian Federation, 66 Fed. Reg. 49,347 (Dep't of Commerce Sept. 27, 2001) ("Magnesium from Russia"), and accompanying Issues Dec. and Mem. at Cmt. 3 ("Magnesium I&D Mem.")).  This is not an instance where JA Solar resold "some" of the solar cells that it purchased from ISEC to the United States but instead represents a particular shipping route where all of ISEC's sales that were sent to JA Solar's subcontractor in [ ████████ ] were ultimately destined for the United States.  See ISEC Second Supp. Sec. A Resp. at 9 (Business Proprietary Version) (C.R. 67) ("All the sales to JA Solar that ISEC reported in the U.S. sales file

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

were those shipped to [ ██████ ] after the parties concluded the discussions on the shipment arrangements to the United States via the module assembly in [ ██████ ] in June 2019.").  The Pistachios and Magnesium cases relied upon by Commerce are distinguishable from this action because they both concern general shipping practices as opposed to conversations between a supplier and its customer concerning a particular shipping route.  In Pistachios from Iran, Commerce found that conversations between a supplier and a customer that the supplier may be required to provide information to Commerce relating to international tariffs on pistachios were insufficient evidence to establish knowledge.  See Pistachios I&D Mem. at Cmt. 1, p. 12 (finding that these conversations related to "general business and export practices").  In Magnesium from Russia, Commerce determined that a the "volume and distribution pattern of a respondent's sales" could not impute knowledge where the information on these general sales patterns was "obtained during the course of the investigation, and there is no evidence on the record indicating that {the respondent} had access to this information at the time of the sale."  Magnesium I&D Mem. at Cmt. 3.  Here, ISEC did not know that its solar cells were destined for the United States based on general shipping knowledge related to tariff actions or data obtained after its sales.  Instead, ISEC obtained, at a minimum, constructive knowledge at the time of its sales to JA Solar that its solar cells were destined for the United States based on its knowledge of specific shipping route implemented by JA Solar where ISEC's solar cells were sent to JA Solar's sub-contractor in [ ██████ ] for assembly into modules prior to being shipped to the United States.

There are two consequences of Commerce's unlawful decision with respect to ISEC's sales to JA Solar.  The first is that U.S. Customs and Border Protection will not collect the calculated amount of antidumping duties for ISEC's sales to JA Solar based on the parties' pricing with respect to the U.S. market and will instead liquidate at the 19.50% "All Others" rate, as if the

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

review never happened.  See Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order, 80 Fed. Reg. 8,596, 8,597 (Dep't of Commerce Feb. 18, 2015).  The second is that by elevating a [ ███████████ ] to rise above a wealth of contrary record evidence demonstrating knowledge, Commerce creates dangerous precedent whereby a future respondent could shield its sales from an AD review by crafty contractual boilerplate.  While it is not the Court's obligation to save Commerce from its own bad decisions, both of these consequences – coupled with the paucity of record evidence supporting Commerce's decision – illustrate the extreme position Commerce adopted.

For these reasons, Commerce's finding that ISEC failed to pass the knowledge test was not supported by substantial evidence because the only reasonable reading of the record as a whole, compared to the mere scintilla of evidence relied upon by Commerce to support its determination, was that ISEC either knew or had reason to know that its sales to JA Solar were destined for the United States.

## CONCLUSION

For the foregoing reasons, JA Solar requests that this Court grant its Motion for Judgment on the Agency Record because the Final Results were not supported by substantial evidence.  To remedy these errors, JA Solar requests that the Court remand the Final Results to Commerce with instructions to find that ISEC had knowledge that its sales to JA Solar were destined for the United States and, accordingly, include these sales in ISEC's AD margin calculation.

Respectfully submitted,

Dated: March 10, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Bryan P. Cenko
*Counsel to JA Solar*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 9,649 words.

Dated: March 10, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Plaintiffs*