UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____
                                        )
JA SOLAR INTERNATIONAL LIMITED,         )
JA SOLAR USA INC.,                      )
                                        )
                    Plaintiffs,         )
                                        )
         v.                             )          Court No. 21-00514
                                        )
UNITED STATES,                          )
                                        )
                    Defendant.          )
_____ )

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment on the agency record, defendant's

response thereto, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is

further

ORDERED that judgment is entered in favor of the United States.


                                        _____
                                              SENIOR  JUDGE


Dated: _____, 2022
        New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | | |
|---|---|---|
| JA SOLAR INTERNATIONAL LIMITED, JA SOLAR USA INC., | ) ) ) | |
| Plaintiffs, | ) ) | Court No. 21-00514 |
| v. | ) ) | **PUBLIC VERSION** |
| UNITED STATES, | ) ) ) | Business Proprietary Information (BPI) Denoted by Brackets [  ] On Pp. 7-10, 14, 20 |
| Defendant. | ) ) ) ) | BPI Bracketing Final |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
BENJAMIN W. JUVELIER
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
for Trade Enforcement and Compliance
Washington, D.C. 20230

JOSHUA E. KURLAND
Trial Attorney
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.Kurland@usdoj.gov

July 8, 2022

*Attorneys for Defendant United States*

TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...................................................................1

I.      The Administrative Determination Under Review ...........................................1

II.     Issue Presented..................................................................................................2

ARGUMENT ...........................................................................................................2

I.      Standard Of Review ..........................................................................................2

II.     Commerce's Application Of The Knowledge Test To Exclude JA Solar's Sales Is
        Supported By Substantial Evidence And Otherwise Lawful ...............................3

        A.  Legal Framework For Determining First Subject United States Sales .........................3

        B.  Commerce Reasonably Determined That ISEC Neither Knew Nor Should Have
            Known That Sales To JA Solar Were Destined For The United States........................6

        C.  JA Solar's Arguments Comparing This Case To Others Lack Merit .........................12

        D.  JA Solar's Additional Arguments Lack Merit ...........................................................18

CONCLUSION.....................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Allegheny Ludlum Corp. v. United States*,
  215 F. Supp. 2d 1322 (Ct. Int'l. Trade 2000) ............................................................... 4

*Atl. Sugar, Ltd., v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ..................................................................................... 3

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ..................................................................................... 2

*Coalition of American Flange Producers v. United States*,
  448 F. Supp. 3d 1340 (Ct. Int'l. Trade 2020) ....................................................... 15, 16

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938) ...................................................................................................... 2

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................. 2, 20

*Durum Gida Sanyi Ve Ticaret A.S. v. United States*,
  311 F. Supp. 3d 1367 (Ct. Int'l Trade 2018) ............................................................... 13

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) ....................................................................................... 2

*Goldlink Indus. Co. v. United States*,
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ................................................................. 3

*Gov't of Argentina v. United States*,
  542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ......................................................... 11, 18

*GSA, S.r.l. v. United States*,
  77 F. Supp. 2d 1349 (Ct. Int'l. Trade 1999) ...................................................... 5, 11, 12

*Hiep Thanh Seafood Joint Stock Co. v. United States*,
  781 F. Supp. 2d 1366 (Ct. Int'l Trade 2011) ............................................................... 18

*Hyundai Electronics Industries Co., Ltd. v. United States*,
  342 F. Supp. 2d 1141 (Ct. Int'l Trade 2004) ..................................................... 4, 5, 13

*INA Walzlager Schaeffler KG v. United States*,
  957 F. Supp. 251 (Ct. Int'l. Trade 1997) ......................................................... 4, 13, 14

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) ...................................................................................................... 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... 19

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ....................................................................... 2

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ..................................................................... 19

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ................................................. 2

*Stupp Corp. v. United States*,
    359 F. Supp. 3d 1293 (Ct. Int'l. Trade 2019) ........................................... 4, 18

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ......................................................................................... 2

*Wonderful Chemical Indus., Ltd. v. United States*,
    259 F. Supp. 2d 1273 (Ct. Int'l Trade 2003) ........................................ 4, 5, 11

## STATUTES

19 U.S.C. § 1516a ................................................................................................... 2

19 U.S.C. § 1677a ................................................................................................... 3

## ADMINISTRATIVE DETERMINATIONS

*Antidumping & Countervailing Duty Proceedings: Assessment of Antidumping Duties
(Reseller Policy)*,
    68 Fed. Reg. 23,954 (Dep't of Commerce May 6, 2003) ........................... 3-4

*Certain Circular Welded Non-Alloy Steel Pipe from Mexico*,
    76 Fed. Reg. 36,086 (Dep't of Commerce June 21, 2011) ...........................16

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*,
    79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) ....................... 5-6, 17, 18

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*,
    86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021) ...............................1

*Certain In-Shell Raw Pistachios from Iran*,
    70 Fed. Reg. 7,470 (Dep't of Commerce Feb. 14, 2005) .......................... 4, 17

*Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic
of Korea*,
    64 Fed. Reg. 69,694 (Dep't of Commerce Dec. 14, 1999) ................................. 12-13

*Grain-Oriented Electrical Steel from the Czech Republic*,
   79 Fed. Reg. 58,324 (Dep't of Commerce Sept. 29, 2014) ............................................12, 13, 17

OTHER AUTHORITIES

Statement of Administrative Action Accompanying the Trade Agreements Act of 1979,
   H.R. Rep. No. 4537 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381 ...............................................4

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____

JA SOLAR INTERNATIONAL LIMITED,   )
JA SOLAR USA INC.,   )
   )
        Plaintiffs,   )   Court No. 21-00514
   )
      v.   )   **PUBLIC VERSION**
   )   Business Proprietary Information (BPI)
UNITED STATES,   )   Denoted by Brackets [  ] On Pp. 7-10, 14, 20
   )   BPI Bracketing Final
        Defendant.   )
_____

### DEFENDANT'S RESPONSE TO PLAINTFFS' RULE 56.2
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiffs JA Solar International Limited and JA Solar USA Inc. (together, JA Solar or plaintiffs).  JA Solar challenges certain aspects of the Department of Commerce's (Commerce's) fifth administrative review of its antidumping duty order on certain crystalline silicon photovoltaic products (solar products) from Taiwan.  We demonstrate below that Commerce's determination is supported by substantial evidence and otherwise lawful, and thus that Commerce's determination should be sustained.

### STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

The administrative determination under review is *Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021) (final admin. review) (Final Results), and the accompanying Issues and Decision Memorandum (IDM) (P.D. 197).  The period of review is February 1, 2019, to January 31, 2020.

## II.  Issue Presented

Whether Commerce's application of its knowledge test, to exclude from the final margin calculation sales made to JA Solar, is supported by substantial evidence and otherwise lawful.

## ARGUMENT

## I.  Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial record evidence, or otherwise unlawful.  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence.").  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing "tremendous" deference to Commerce factual findings).  It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for

Commerce's in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).  As a result, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them.  *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.   Commerce's Application Of The Knowledge Test To Exclude JA Solar's Sales Is Supported By Substantial Evidence And Otherwise Lawful

### A.  Legal Framework For Determining First Subject United States Sales

The issue in this case stems from Commerce's "knowledge test" for determining a company's first subject sale to the United States.  Hence, we provide a brief synopsis of the legal framework relating to Commerce's test.

The statutory definition of the "export price" for a sale of subject merchandise is

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677a(a).  Commerce interprets the statutory term "first sold" as denoting the first party in the sales chain with knowledge of the merchandise's United States destination at the time of sale, which allows Commerce to determine which entity was the "price discriminator" that may have engaged in dumping (and hence which company's dumping margin should apply to the entry).  *See Antidumping & Countervailing Duty Proceedings: Assessment of Antidumping*

*Duties (Reseller Policy)*, 68 Fed. Reg. 23,954, 23,957 (Dep't of Commerce May 6, 2003); *see also* IDM at 8 (discussing Commerce's well-established interpretation).

Commerce has operationalized this analysis by establishing a so-called "knowledge test" to determine whether sales should be treated as United States or third-country sales. IDM at 8-9. Specifically, if the record evidence indicates that the seller "knew or had reason to know" at the time of sale that the goods were for export to the United States, then Commerce will include those sales in determining the export price. Statement of Administrative Action Accompanying the Trade Agreements Act of 1979, H.R. Rep. No. 4537, at 411 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 682. This Court has held that requiring actual knowledge would be so high a bar as to "eviscerate the acknowledged standard." *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1332 (Ct. Int'l. Trade 2000). Therefore, Commerce's application of the knowledge test requires either actual or constructive knowledge of the destination of goods being sold. *See Wonderful Chemical Indus., Ltd. v. United States*, 259 F. Supp. 2d 1273, 1279 (Ct. Int'l Trade 2003); *Hyundai Electronics Industries Co., Ltd. v. United States*, 342 F. Supp. 2d 1141, 1146 (Ct. Int'l Trade 2004). Nonetheless, the knowledge test entails a "high" standard. *E.g.*, *Certain In-Shell Raw Pistachios from Iran*, 70 Fed. Reg. 7,470 (Dep't of Commerce Feb. 14, 2005), and accompanying IDM Cmt. 1 (*Pistachios from Iran*).

Actual knowledge requires "an admission of the respondent" that the company knew the actual destination of the merchandise being sold. *INA Walzlager Schaeffler KG v. United States*, 957 F. Supp. 251, 265 (Ct. Int'l. Trade 1997). Constructive knowledge, however, requires that Commerce must "diligently inquire into allegations of knowledge and render its conclusion based on all relevant facts and circumstances," not just on respondent admissions. *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l. Trade 2019) (citation omitted), *aff'd in*

4

*part, vacated in part, remanded on other grounds*, 5 F.4th 1341 (Fed. Cir. 2021).  In *GSA, S.r.l. v. United States*, for example, this Court identified three factors together illustrating a company's constructive knowledge of pasta exports' destination in the United States:  (1) producer-prepared certificates stating that the pasta's destination was the United States; (2) import labels that stated the destination of the exports; and (3) use of a particular package size that was standard for the United States, but not for other export destinations.  *See* 77 F. Supp. 2d 1349, 1355 (Ct. Int'l. Trade 1999).  Similarly, in *Wonderful Chemical Industries*, the Court sustained Commerce's finding of constructive knowledge when (1) the producer prepared certificates of origin for the products that stated that they were bound for the United States and (2) the producer stated that it only sold the products to a particular intermediary, which in turn only sold to the United States. *See* 259 F. Supp. 2d at 1279-80.  Likewise, in *Hyundai Electronics Industries Co.*, the Court found that substantial evidence supported a finding of constructive knowledge when statements of ex-employees accusing a company of establishing a sales channel to engage in dumping were corroborated by data from the United States Customs Service (Customs), which independently tested the accuracy of the employees' statements.  *See* 342 F. Supp. 2d at 1145-49.  In each case, Commerce wove together multiple, mutually-supportive threads of evidence indicating actual or constructive knowledge of a final export destination in the United States.

Typically, to support inquiries into knowledge, Commerce considers documentary or physical evidence (rather than relying solely on employee statements or declarations) because such documentary evidence tends to be more probative, reliable, and verifiable.  *See Wonderful Chemical*, 259 F. Supp. 2d at 1279-80 & n.4. (relying on certificates and physical evidence, and describing how certificates prepared by respondent explicitly listed United States port of entry); *see also Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 79 Fed. Reg. 76,966

PUBLIC VERSION
BPI Bracketing Final

(Dep't of Commerce Dec. 23, 2014), at IDM Cmt. 4 (*Solar Taiwan Investigation*) (discussing practice to "give greater consideration to physical evidence and documentation prepared at the time of a transaction than to unsubstantiated statements or declarations that may be in the best interest of the investigated company sourcing those statements") (quoted at IDM at 10).

Commerce applied these principles during the investigation in this Taiwan solar products proceeding to exclude a large portion of the sales reported by a mandatory respondent company, Gintech Energy Corporation (Gintech), upon concluding that sworn affidavits from Gintech's employees did not satisfy the knowledge test when they were made "well after the sales at issue had occurred."  *Solar Taiwan Investigation*, 79 Fed. Reg. 76,966, at IDM Cmt. 4 (disagreeing with Gintech's contention that record contained "overwhelming evidence" that it had knowledge of merchandise's ultimate destination); *see* IDM at 9-10 (discussing case).

### B. Commerce Reasonably Determined That ISEC Neither Knew Nor Should Have Known That Sales To JA Solar Were Destined For The United States

Substantial evidence supports Commerce's determination that the respondent at issue in the underlying administrative proceeding, Inventec Solar Energy Corporation and E-TON Solar Tech. Co., Ltd. (together, ISEC), did not possess actual or constructive knowledge that its sales to JA Solar were destined for the United States.  Thus, Commerce properly excluded those sales when calculating ISEC's final dumping margin.  JA Solar's contrary arguments are meritless because Commerce's findings stem from a reasonable interpretation of the statute, follow well-developed case law surrounding the knowledge test, and are rooted in the record evidence.

JA Solar claims that ISEC had both actual and constructive knowledge that its sales to JA Solar were destined for the United States.  *E.g.,* JA Solar Br. 4.  As in the situation involving Gintech, however, JA Solar relies significantly on sworn *ex post* affidavits from its employees and those of ISEC to show that ISEC knew (or should have known) that its sales to JA Solar

6

were destined for the United States.  *See* IDM at 10-11.[1]  In the ISEC affidavit, Dino Yang,

ISEC's sales manager, declared that "starting from June 2019 . . . I was aware of the fact that our

solar cells sold to JA Solar, that were to be shipped to [          ], were destined for the United

States after its designated subcontractor completed the assembly process in [          ]."  ISEC

Supp. Questionnaire Resp. – Part 1, P.D. 78; C.D. 30 at Ex. SA-ISEC-5, ISEC Affidavit ¶ 2

(Aug. 24, 2020).  The initial shipments to which Mr. Yang was referring, however, were made

without a purchase contract in place and stemmed from an informal agreement made through

WeChat, which indicated that the cells were to be shipped to the United States.  *See* IDM at 10.

The fundamental problem with JA Solar's position is that it seeks to rely on these initial

discussions and shipments, while disregarding (or inappropriately minimizing) record evidence

that the companies' discussions continued through negotiation of a formal contract, in which

ISEC required language indicating that it *did not* know for certain whether the merchandise it

sold to JA Solar was destined for the United States.  Indeed, the affidavits JA Solar cites were

submitted in response to Commerce's request for further information following ISEC's

questionnaire response:

> ISEC knew that the ultimate destination of the sales to JA Solar
> was the United States because the *purchase contracts* that JA Solar
> issued to ISEC usually contained a remark specifying that solar
> cells purchased from ISEC *may* be used to make PV modules for
> delivery to the United States. . . .

ISEC Section A Questionnaire Resp. – Part 1, P.D. 57; C.D. 10 at A-2 (July 17, 2020) (emphasis

added).  Mr. Yang himself stated that, during formal contract negotiations, ISEC's in-house

---

[1] JA Solar contends that the affidavits are supported by further documentary evidence,
but as we elaborate below, Commerce reviewed the evidence and found that "the record in this
case shows that ISEC's own statements made *prior* to the sales amount to an admission that it
did *not* have such knowledge prior to the sales or at the time of the sales, and that the first party
that did have such unambiguous knowledge was its customer."  *Id.* (emphasis in original).

counsel required revised contract language because "JA Solar, and not ISEC, was responsible for the final delivery to the United States after ISEC delivered the solar cells to [          ]."  ISEC Supp. Questionnaire Resp. – Part 1, P.D. 78; C.D. 30 at Ex. SA-ISEC-5, ISEC Affidavit ¶ 3 Correspondingly, [                                        ], also indicated that ISEC was [

                                        ].  *See id.* at Parts 1-2, P.D. 78; C.D. 30-31 at Ex. SA-ISEC-5, JA Solar Affidavit ¶¶ 8-10.  JA Solar's position thus reduces to a disagreement with Commerce's interpretation of the documentary record evidence concerning the course of negotiations between ISEC and JA Solar.

Because JA Solar presents its own curated interpretation of the record, we set forth below relevant facts, consistent with Commerce's explanation of its determination.  *See* IDM at 10. According to the affidavits, and the supporting text messaging and email threads, JA Solar and ISEC first began communicating regarding the sale of solar cells to be assembled in [        ] starting in March 2019.  *See id.*; ISEC Supp. Questionnaire Resp. – Parts 1-2, P.D. 78; C.D. 30-31 at Ex. SA-ISEC-5, JA Solar Affidavit ¶ 6.  These communications took the form of a WeChat conversation between ISEC's [                                        ] and JA Solar's [

          ].  *See id*.  In the conversation, [            ] asked whether there will be [                    ] to use the cells sold to JA Solar in the United States market, to which the response was simply [        ].  ISEC Supp. Questionnaire Resp. – Part 2, P.D. 78; C.D. 31 at Ex. SA-ISEC-5, WeChat Messages behind JA Solar Affidavit.  Following the conversation, [

        ] and [                ] discussed changing standard contract language to indicate that [

                                        ].  *Id.*  After discussions with ISEC legal staff, [              ] stated that such language was [                              ].  *Id.*;

*see id.* ([

]).

As Commerce explained, a key issue in the ensuing negotiations was whether there was certainty that the destination of ISEC's solar cells would be the United States.  *See* IDM at 10 (citations omitted).  The contract language was thus negotiated and re-negotiated several times. *See id.*  First, in a draft dated August 27, 2019, the contract stated:  [

].  ISEC Supp. Questionnaire Resp. – Part 2, P.D. 78; C.D. 31 at Ex. SA-ISEC-5, Email Messages behind JA Solar Affidavit. In an email exchange following this draft, representatives from ISEC and JA Solar went through two more iterations of this language.  *Id.*  First, in an email dated August 28, 2019, the provision stated:  [

].  *Id.*; *see also id.* (stating that this was [

]).  One day later, moreover, the language was edited to say:  [

].  *Id.* (emphasis added).

Ultimately, in an email dated September 6, 2019, ISEC and JA Solar agreed on the final language of the purchasing contract:  [

]  *Id*. and accompanying

9

Contract (emphasis added).  Although no other destination had been specifically named for this

set of solar cells, JA Solar had purchased solar cells from ISEC for modules delivered to [

                                            ].  *Id.* at Part 1, P.D. 78; C.D. 30 at Ex. SA-ISEC-5, JA Solar

Affidavit ¶ 3.  Throughout the summer of 2019, as negotiations were ongoing, ISEC's actions (as

documented by the record) demonstrate that there was doubt as to the ultimate destination of the

assembled solar modules after assembly by JA Solar in [            ].

      Commerce succinctly summed-up this record evidence in its determination:  "At the end

of the negotiations, the contract terms agreed upon by parties deliberately left ambiguous the

ultimate destination of the merchandise{.}"  IDM at 10 (citations omitted).  In the contract,

ISEC, in effect, disclaimed knowledge of the merchandise's ultimate destination.  Such

knowledge is the essence of Commerce's knowledge test.  *Id.*

      JA Solar attempts to minimize this evidence by characterizing it as a [                              ]

change to the contract that was required by ISEC's counsel and did not change the underlying

understanding between the companies.  *E.g.*, JA Solar Br. 6-7.  However, this is both inaccurate

because the relevant provision changed significantly (*see* emphases above) and misleading

because the change is a meaningful one that formalized the companies' relationship in a manner

contrary to JA Solar's knowledge claim.  *See* IDM at 10 ("Although ISEC claims that this

contract language is not meaningful, the negotiated language that ISEC officials required in the

contract indicates that ISEC really did not know where the solar cells would ultimately go.").

Further, JA Solar's claims that the *ex post* affidavits that it cites are supported by documentary

evidence rely on the same text messages, emails, and draft contract language that Commerce

weighed as indicating that ISEC disclaimed knowledge of the merchandise's destination in the

final agreement (which JA combines with an illogical insistence that the earlier messages and

*draft* language trump the later, final language).  *See* JA Solar Br. 5, 8-11, 17-19 (relying on

"draft" contact language).[2]  JA Solar's "mere disagreement" with Commerce's weighing of

record evidence is not a basis to overturn Commerce's determination.  *Gov't of Argentina v.*

*United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (citation omitted).

More generally, Commerce explained that the affidavits forming the core of JA Solar's

claim "are the same type of self-serving statements that we refused to consider as valid evidence

of knowledge in the investigation of this proceeding, when such statements were presented to

Commerce at verification by the respondent Gintech" because "memories of employees, even as

sworn statements, are not documentary evidence of knowledge of the destination."  IDM at 10-

11 (citations omitted).  When Commerce examines such *ex post*, self-interested submissions, the

knowledge test generally requires multiple factors working together to support a constructive

knowledge finding.  *See*, *e.g.*, *Wonderful Chemical*, 259 F. Supp. 2d at 1279-80 (relying on

certificates of origin and physical evidence to show constructive knowledge).

The *GSA, S.r.l.* decision is instructive.  In *GSA, S.r.l.*, concerning an administrative

review of pasta from Italy, Commerce applied the knowledge test for sales between GSA and

one of its producers to determine that GSA (a trading company in Italy that arranged to produce

pasta with various companies across the country) was *not* the first unaffiliated purchaser for

exportation into the United States.  *See* 77 F. Supp. 2d at 1354-55.  Evidence on the record in

*GSA, S.r.l.* included, not only questionnaire responses and assertions, but also documentary and

physical evidence.  *See id.*  First, GSA's producer completed the paperwork to certify the pasta

---

[2]  Similarly, as Commerce indicated in its determination, JA Solar's contentions based on
evidence that solar cells it purchased from ISEC ultimately did end up being sold to the United
States (JA Solar Br. 12-14) are not persuasive because they do not address whether ISEC had
knowledge of the merchandise's ultimate destination *at the time of its sales* to JA Solar under the
contract.  *See* IDM at 11 ("whether or not the merchandise entered the U.S. market is not the
issue at hand, but rather, {the issue is} which entity set the price for the U.S. market").

PUBLIC VERSION
BPI Bracketing Final

for export specifically to the United States.  *See id*.  The producer both manufactured the pasta's

labeling and chose a package size only used in the United States, rather than Europe where its

other exports were focused.  *See id*.  Lastly, the producer had recently acquired a rival known to

do business with the United States, and it retained the export-import officer from that rival

company (along with the knowledge of exports to the United States that he possessed).  *See id*.

In this case, no such evidence exists.  In fact, the sole piece of contemporary

documentary or physical evidence as to ISEC's and JA Solar's final understanding is the final

purchase contract, which does not definitively specify the destination of ISEC's solar cells.

Given these circumstances, Commerce reasonably concluded that ISEC's sales to JA Solar did

not meet the knowledge test, and JA Solar's contrary arguments lack merit.

### C.  <u>JA Solar's Arguments Comparing This Case To Others Lack Merit</u>

JA Solar's arguments attempting to compare this case to other circumstances in which

Commerce has applied its knowledge test equally lack merit.

First, at pages 14 to 15 of its brief, JA Solar makes an inapposite comparison of this case

to Commerce's determination in *Grain-Oriented Electrical Steel from the Czech Republic*, 79

Fed. Reg. 58,324 (Dep't of Commerce Sept. 29, 2014), and accompanying IDM Cmt. 2 (*Grain-

Oriented Electrical Steel*), for the notion that Commerce should have accepted the ISEC and JA

Solar affidavits as demonstrating actual knowledge by ISEC.  In *Grain-Oriented Electrical Steel*,

Commerce reiterated that its "practice has generally been to consider documentary or physical

evidence that the party knew or should have known its goods were destined for the United States,

*because this type of evidence is more probative, reliable and verifiable than unsubstantiated*

*statements or declarations*."  *Id.* (emphasis added).  Commerce added that an admission by a

producer or its representative "can" also establish knowledge, while citing *Dynamic Random*

*Access Memory Semiconductors of One Megabit or Above from the Republic of Korea*, 64 Fed.

Reg. 69,694 (Dep't of Commerce Dec. 14, 1999) (*DRAMs from Korea*), in which employee

admissions were corroborated by Customs.  But Commerce made no such determination in

*Grain-Oriented Electrical Steel*—rejecting the domestic industry's claim of a foreign producer's

knowledge—and it did not disclaim its preference for documentary evidence compared to

unsubstantiated statements.  79 Fed. Reg. 58,324, at IDM Cmt. 2; *cf. Durum Gida Sanyi Ve

Ticaret A.S. v. United States*, 311 F. Supp. 3d 1367, 1372 (Ct. Int'l Trade 2018) ("*Durum* fails to

establish how Commerce's stated practice of attaching 'more weight to documentary evidence

than to statements such as declarations' was unreasonable in light of the record.").

JA Solar also cites *DRAMs from Korea* (as it was later litigated in *Hyundai Electronics*,

342 F. Supp. 2d 1141) and *INA Walzlager*, 957 F. Supp. 251, as examples of cases in which

Commerce had similar amounts of documentary evidence and made a finding of constructive

knowledge regarding the destination of the sales.  *See* JA Solar Br. 15-17.  However, the

circumstances of those cases differ substantially from this one.

In *Hyundai Electronics*, the company at issue (LG Semicon) shipped DRAMs through a

customer's German subsidiary, which would then ship them to the United States.  *See* 342 F.

Supp. 2d at 1145-46.  Commerce obtained this information through statements in an interview

and email from two former LG Semicon employees, claiming that the company was "knowingly

and willingly" dumping DRAMs in the United States market through a new sales channel.  *Id.*

Importantly, Commerce then corroborated these whistleblower-type statements with customs

data showing the existence of the sales channel that the former employees had alleged.  *Id*. at

1148-49.  Unlike *DRAMs*/*Hyundai Electronics*, the allegedly corroborating evidence in this case

does not support the knowledge allegations because it shows ISEC ultimately indicating that it

*lacked* knowledge of the merchandise's destination.  *See* IDM at 10.  Nor does the customs data that JA Solar cites, which simply shows that merchandise was ultimately sold to the United States, corroborate ISEC's alleged knowledge at the time of its sales to JA Solar.  *See id.* at 11.  Thus, the primary record information supporting JA Solar's claim of knowledge is the affidavits themselves, which serve to support the respondents' interests.  *See id.* at 10-11.  As Commerce stated, this case is more akin to its determination regarding Gintech in the underlying *Solar Taiwan Investigation* than to *DRAMs/Hyundai Electronics*.  *Id.* at *11.*

JA Solar cites *INA Walzlager* to illustrate that Commerce can rely on interviews with a respondent's customers in finding that the respondent "knew or should have known" that its products were intended for export to the United States.  *See* JA Solar Br. 16; 957 F. Supp at 264.  However, equally important in *INA Walzlager* was that these statements were corroborated, not only by interviews with the respondent firm and one specific customer, but with *many* different customers across Germany.  *See* 957 F. Supp at 264-65.  The Managing Director from *INA Walzlager* quoted by JA Solar specifically stated that "all of the suppliers know that the firm 'is solely an exporter from their years of doing business with his company,'" which is important in identifying a question of home market versus export sales.  *Id.* (citation omitted).  Notably, in this case, the record shows that JA Solar not only serves markets other than the United States, but also that ISEC had done business with JA Solar [

          ].  ISEC Supp. Questionnaire Resp. – Part 1, P.D. 78; C.D. 30 at Ex. SA-ISEC-5, JA Solar Affidavit ¶ 3.  Even with the statements of customers in *INA Walzlager*, Commerce still relied on additional documentary evidence (specifically, export price lists matching sales data) to support its finding that the respondent company knew its sales were intended for export markets; no such external documentary evidence exists in this case.  *See* 957 F. Supp. at 265.

14

In another case, *Coalition of American Flange Producers v. United States*, this Court again reviewed whether Commerce's determination that a respondent company "knew or should have known" that certain stainless steel flanges were destined for export (rather than the home market) was supported by substantial evidence.  448 F. Supp. 3d 1340 (Ct. Int'l. Trade 2020). The respondent company, Chandan, "asserted it did not know the final destination of the merchandise," but still stamped it with a particular logo providing evidence that the merchandise was to be exported.  *Id.* at 1354.  Despite remanding the issue, the Court stopped short of making its own finding, recognizing instead that the Court affords substantial deference to Commerce's experience and expertise in such determinations.  *See id.* (stating "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" (citations omitted)).  The Court also distinguished *INA Walzlager* because in that case "verified, uncontroverted evidence strongly support{ed}" the inference that sales were destined for the export market, whereas Chandan's "own treatment of the sale raised unanswered questions about its interpretation."  *Id.* at 1355.

Notwithstanding the Court's remand, the record evidence in *Coalition of American Flange Producers* is similar to this case.  In contrast to *INA Walzlager*, the evidence provided by JA Solar is inherently contradictory and raises more questions than it does answers.  *See* IDM at 10-11.  Although JA Solar argues that the changes to the sales contract language constituted a minor and unimportant detail, the fact remains that the two companies spent several weeks in negotiations to arrive at more flexible wording.  IDM at 10; ISEC Supp. Questionnaire Resp. – Part 2, P.D. 78; C.D. 31 at Ex. SA-ISEC-5, Email Messages behind JA Solar Affidavit.  Because the contract indicates that ISEC had uncertainty about the destination of its sales (despite its later assertions), Commerce must choose between two potentially reasonable alternatives.  *See* IDM at

10 ("At the end of negotiations, the contract terms agreed upon by parties deliberately left ambiguous the ultimate destination of the merchandise.").  Unlike *Coalition of American Flange Producers*, however, Commerce in this case "explain{ed} its choice" between the alternatives.  448 F. Supp. 3d at 1355; *see*, *e.g.*, IDM at 10 (explaining that "the negotiated language that ISEC officials required in the contract indicates that ISEC really did not know where the solar cells would ultimately go" and that "{s}uch knowledge is the essence of Commerce's knowledge test").[3]  Thus, the case law supports sustaining Commerce's determination.

In addition to being consistent with relevant jurisprudence, Commerce's determination is also consistent with agency practice in other administrative proceedings applying the knowledge test.  In *Certain Circular Welded Non-Alloy Steel Pipe from Mexico*, for example, Commerce considered whether a company "knew or should have known" that its products were shipped by a customer to the United States.  76 Fed. Reg. 36,086 (Dep't of Commerce June 21, 2011), and accompanying IDM Cmt. 1 (*Pipe from Mexico*).  JA Solar argues that this determination is distinguishable because the respondent "expressly denied" knowledge of United States sales, whereas in this case the responding companies "expressly admit" it.  JA Solar Br. 19 n.6.  However, Commerce's reasoning is similar in both cases.  Commerce explained in *Pipe from Mexico* that "general knowledge or belief" that an exporter sells to the United States, or the possibility that goods "might" be destined for the United States is insufficient evidence to prove knowledge absent other substantial factors.  76 Fed. Reg. 36,086, at IDM Cmt. 1 (identifying several "normal factors indicative of knowledge" not present in this case).

---

[3]  Much of the specifics of the contract language and communications between ISEC and JA Solar consisted of information marked as confidential in the underlying review, which Commerce generally does not include in its public decision memoranda.  Commerce nonetheless explained why it found that ISEC did not meet the knowledge test.

Likewise, in *Pistachios from Iran*, Commerce explained that the standard for the knowledge test is "high." 70 Fed. Reg. 7,470, at IDM Cmt. 1. It also explained, as in *Pipe from Mexico*, that "general knowledge or belief" that goods "might" be destined for the United States is insufficient to prove knowledge and listed types of documentary evidence (not present in this case) on which Commerce would rely to establish constructive knowledge. *Id.* Such evidence includes items like packaging or labeling materials unique to United States sales of the subject merchandise, or signed documentation (such as a signed contract) stating the ultimate United States destination. *See id.* As in this case, Commerce in *Pistachios from Iran* found a lack of documentary evidence to support a knowledge claim. *Id.*; *see also Grain-Oriented Electrical Steel*, 79 Fed. Reg. 58,324, at IDM Cmt. 2 (also stating standard for knowledge test is "high"); IDM at 9 (discussing past determinations and resulting practice).

Finally, as Commerce explained in its IDM, Commerce's determination in this case is consistent with its determination that the producer Gintech lacked knowledge that a large portion of its sales were destined for the United States in the underlying *Solar Taiwan Investigation*, 79 Fed. Reg. 76,966, at IDM Cmt. 4. *See* IDM at 9-10, 10-11. In that segment of the proceeding, as in this one, Commerce concluded that sworn affidavits that were executed "well after the sales at issue had occurred" and unsupported by sufficient documentary evidence did not satisfy the knowledge test. *Solar Taiwan Investigation*, 79 Fed. Reg. 76,966, at IDM Cmt. 4. JA Solar seeks to distinguish the *Solar Taiwan Investigation* on the grounds that the record in this case contained the documentary evidence that the investigation record lacked. *See* JA Solar Br. 17-19. But as we established above, JA Solar's "documentation" contention is based on record evidence—such as a "draft contract" later revised to indicate uncertainty about the merchandise's destination—that Commerce reasonably determined suggested the *opposite* conclusion from the

17

one JA Solar draws.  *See id.*; *cf. Solar Taiwan Investigation*, 79 Fed. Reg. 76,966, at IDM Cmt. 4

(disagreeing with Gintech's contention that record contained "overwhelming evidence" that it

had knowledge of merchandise's ultimate destination).  Commerce's determination in this

review is thus consistent with its determination in the underlying investigation.

### D.  JA Solar's Additional Arguments Lack Merit

JA Solar makes several additional arguments that also lack merit.

First, citing *Stupp* and *Hiep Thanh Seafood Joint Stock Co. v. United States*, 781 F. Supp.

2d 1366 (Ct. Int'l Trade 2011), JA Solar claims at pages 19 to 20 and other places throughout its

brief that Commerce either ignored or failed to consider relevant evidence and argument.  *See*,

*e.g.*, JA Solar Br. 19-20.  This is refuted by not only (1) Commerce's analysis (which clearly

considered the evidence of the parties' dealings and disagreed with JA Solar's interpretation), but

also (2) Commerce's thorough summary of ISEC's and JA Solar's arguments before the agency,

documenting that Commerce lawfully considered the evidence and argument.  *See* IDM at 5-8.

From the summary, it is apparent that ISEC and JA Solar made arguments before Commerce

similar to those JA Solar now makes before this Court.  *See id.*  Rather than failing to consider

these arguments and underlying evidence, Commerce considered the record and disagreed with

JA Solar.  *See* IDM at 12.  As we explained above, "mere disagreement" with Commerce is not a

basis to overturn Commerce's determination.  *Gov't of Argentina*, 542 F. Supp. 3d at 1395.

Similarly, JA Solar claims that Commerce provided no explanation for its determination

and its unwillingness to rely on the *ex post* affidavits and draft contract language (as well as

related communications) *over* the evidence stemming from the revisions leading to the final

contract language.  *E.g.*, JA Solar Br. 20.  But the record shows that Commerce explained its

determination (JA Solar's disagreement notwithstanding).  Commerce explained its knowledge

test and the requirement for more specific evidence than general knowledge that sales might be shipped to the United States. IDM at 8-9. Commerce also explained its preference for timely documentary and physical evidence, compared to the problematic nature of sworn statements made well after the time of sale (as reflected in the history of this very proceeding). *Id.* at 9-10, 10-11. Commerce further explained that it had a different interpretation of the communications surrounding the several contract re-negotiations that ultimately produced a provision expressing uncertainty regarding the ultimate destination of the merchandise that ISEC was selling to JA Solar. *E.g.*, *id.* at 10 ("ISEC's own statements made *prior* to the sales amount to an admission that it did *not* have such knowledge prior to the sales or at the time of the sales, and that the first party that did have such unambiguous knowledge was {JA Solar}"), 12 ("ISEC reiterated its uncertainty prior to the sales regarding the ultimate destination of these solar cells"). Along the way, Commerce explained why its determination is consistent with its prior determinations and this Court's decisions. *See*, *e.g.*, *id.* at 11-12. Given that Commerce's explanations do not have to be perfect, but merely "reasonably discernable," Commerce's determination amply meets the standard. *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Finally, JA Solar claims that Commerce's determination relies on a "mere scintilla" of evidence and that "the only reasonable reading {of the record} is that ISEC either knew (actual knowledge), or, at a minimum, had reason to know (constructive knowledge) that its sales to JA Solar were destined to the United States." JA Solar Br. 22; *see generally id.* at 22-28. But this argument is merely a corollary of JA Solar's efforts to disregard or inappropriately minimize the evidence showing that ISEC negotiated for, and ultimately required, a final contract provision expressing its uncertainty about the ultimate destination of the solar cells that it was selling to JA

PUBLIC VERSION
BPI Bracketing Final

Solar, in favor of the initial communications and draft language that JA Solar highlights.  *See*

IDM at 10-11 (discussing Commerce's interpretation of this evidence).  As we explained above,

JA Solar's characterization of the revisions to the contract as minimal and unimportant is both

factually incorrect and misleading because the contracting parties formalized the seller-buyer

relationship in a manner contrary to JA Solar's knowledge claim.  *See* IDM at 10.  JA Solar also

attempts to characterize the sales at issue as ones that ISEC knew were bound for the United

States based on the specific shipping route, *see* JA Solar Br. 25-27, but this is both contradicted

by the contract language itself and by the record information that ISEC had done business with

JA Solar [                                                                      ].  ISEC Supp.

Questionnaire Resp. – Part 1, P.D. 78; C.D. 30 at Ex. SA-ISEC-5, JA Solar Affidavit ¶ 3 and

Contract.  Although JA Solar may reasonably adopt a contrary interpretation of the record,

rooted in the characterizations made by its self-serving affidavits, it is clear that Commerce's

determination is supported by substantial record evidence.  *See Consolo*, 383 U.S. at 620

(possibility of drawing inconsistent conclusions from record does not render findings

unsupported by substantial evidence).

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motion for

judgment upon the agency record and sustain Commerce's determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          /s/ Joshua E. Kurland
BENJAMIN W. JUVELIER                 JOSHUA E. KURLAND
Attorney                             Senior Trial Counsel
Office of the Chief Counsel          U.S. Department of Justice
for Trade Enforcement and Compliance Civil Division
U.S. Department of Commerce          Commercial Litigation Branch
                                     PO Box 480, Ben Franklin Station
                                     Washington, DC 20044
                                     Tel: (202) 616-0477
                                     Fax: (202) 353-0461
                                     Email: Joshua.E.Kurland@usdoj.gov

July 8, 2022                         *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation set forth in the Court's

Standard Chambers Procedures and contains approximately 6,334 words, excluding parts of the

brief exempted from such word limitations.  In preparing this certificate of compliance, I have

relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Joshua E. Kurland</u>